UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
                                      )
KVAERNER PHILADELPHIA SHIPYARD, INC.,  )
                                      )
        Plaintiff,                    )
                                      )
    v.                                )   No. 02-CV-3710
                                      )
PHILADELPHIA METAL TRADES COUNCIL, *et al*.,  )
                                      )
        Defendants.                   )
_____)

**MEMORANDUM OF DEFENDANTS PHILADELPHIA METAL TRADES COUNCIL, RON AULT AND PHILIP ROWAN IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Defendants Philadelphia Metal Trades Council ("PMTC" or "Council"), Ron Ault and Philip Rowan hereby submit this Memorandum in Opposition to the Motion for Preliminary Injunction filed by Kvaerner Philadelphia Shipyard, Inc. ("Kvaerner") on June 11, 2002.

## I.   INTRODUCTION

In filing its Motion for Preliminary Injunction, Kvaerner asks this Court to push the proverbial square peg into a round hole. The Company seeks a "*Boys Market*" injunction, *i.e.*, an injunction that restrains picketing allegedly in violation of a no-strike clause in a collective bargaining agreement and that orders the parties to arbitrate the underlying dispute pursuant to the agreement's grievance and arbitration procedure. *See Boys Market, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970). However, the facts of this case do not fit within the *Boys Market* exception to the Norris-LaGuardia Act's broad proscription against federal courts issuing injunctions in labor disputes. *See* 29 U.S.C. § 104 (2001). Rather, this case falls roundly within the "exception to the exception", which provides that an injunction cannot be issued

where the underlying dispute is not arbitrable. *See Buffalo Forge Co. v. United Steelworkers of Am.*, 428 U.S. 397 (1976). Contrary to Plaintiff Kvaerner's assertions, the underlying dispute in this case does not concern the subcontracting language in the collective bargaining agreement, nor does it arise in any other fashion under that agreement. Rather, the underlying dispute, over which defendant Asbestos Workers Local 14 engaged in picketing, concerns that labor organization's unhappiness and desire to advertise that a particular subcontractor who happens to be working at Kvaerner's facility is paying wages that are below the area standards for insulators. This "area standards" dispute is not arbitrable under the collective bargaining agreement and, thus, a *Boys Market* injunction should not issue.

In addition, Kvaerner fails to establish the other prerequisites required for *Boys Market* relief, such as establishing irreparable harm to the arbitral process itself. Last, but not least, Kvaerner has failed to establish any facts that could justify an injunction enjoining these defendants, especially where there is no evidence they engaged in picketing and that an injunction against them could further control those who are actually engaged in the picketing.

As explained *infra*, the Plaintiff's own motion and supporting papers demonstrate, as a matter of law, that a preliminary injunction should not be issued. These Defendants respectfully request that the Court deny the Plaintiff's Motion for Preliminary Injunction.

## II. STATEMENT OF FACTS

### A. Background: The Philadelphia Metal Trades Council

#### 1. The Purpose and Composition of the Council

The Philadelphia Metal Trades Council is a labor organization that has been chartered by the Metal Trades Department ("MTD") of the American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO"). (*See* Declaration of Ron Ault ("Ault Decl.") ¶ 12. *See*

*also* Ault Decl., Ex. 2 at 1.)   The MTD chartered the Council as a local Metal Trades Council. A local Metal Trades Council provides assistance to affiliated labor organizations in organizing, collective bargaining and political action. (*See* Ault Decl. ¶ 18.)  Thus, the Council is a "labor organization" for purposes of the National Labor Relations Act, 29 U.S.C. § 141 *et seq.*, and Section 301 of the Taft Hartley Act, 29 U.S.C. § 185.  *See* 29 U.S.C. 152(5) (defining "labor organization").

The Council provides assistance in organizing, collective bargaining and political action to those local unions that are affiliated with the Council. (Ault Decl. ¶ 18.)  The Council is governed by a Constitution and Bylaws.  (Ault Decl. Ex. 2.)  Article II of the Council Constitution and By-Laws provides, "[t]he Philadelphia Metal Trades Council shall be composed of affiliated local Unions whose membership are employed within the defined jurisdiction. . . ."  (*Id.*, Ex. 2 at 1.)

Currently, there are approximately eleven local unions that are affiliated with the Council, including but not limited to local unions of international unions such as United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada; the International Brotherhood of Electrical Workers; the Sheet Metal Workers International Association; International Brotherhood of Boilermakers, Blacksmiths, International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers; and the International Association of Heat, Frost, Insulation and Asbestos Workers.  (Ault Decl. ¶ 13.)  These international unions are all affiliates of the MTD and the AFL-CIO. (*Id.* at ¶ 4.)

One of the Council's affiliates is defendant Insulation and Asbestos Workers Local 14 ("Asbestos Workers 14" or "Local 14").  Asbestos Workers Local 14 is not only an affiliate of the Council, but also of the local building and construction trades council.  (Ault Decl. ¶ 15.)

The Council is autonomous and independent from any and all of its local union affiliates. (Ault Decl. ¶ 16.) The Council is governed by its Constitution and Bylaws while the local union affiliates are governed by their own bylaws as well as the constitutions of their parent international unions. (*Id.*)

2. Control of the Council's Affairs

Until July 1999, an Executive Board controlled the day-to-day operations of the Council. (Ault Decl. ¶ 17.) Article X of the Council Constitution and Bylaws provides, in relevant part, that, "[t]he Executive Board of this Council shall consist of the duly elected Council officers and one representative from each affiliated local union from which no officer is elected…." (Ault Decl., Ex. 2 at 14.) The Executive Board was "empowered to handle all urgent business and matters pertaining to the Council, between meetings of the Council, and it shall handle effectively and properly all matters referred to it by the Council." *Id.*

However, in July 1999, for reasons unrelated to the current events, the MTD placed the Council into "trusteeship" and removed its officers. (Ault Decl. ¶ 17.) The day-to-day operations of the PMTC is now currently in the hands of a Trustee, who since October of last year has been defendant Ron Ault. (*Id.* at ¶¶ 19, 20.) Ron Ault is the authorized representative of the Council; individuals such as Philip Rowan and other former officers of the Council's affiliates are not authorized to act on behalf of the Council. (*Id.* at ¶ 20.)

3. The Collective Bargaining Relationship at the Philadelphia Shipyard

In 1998, Kvaerner Philadelphia Shipyard, Inc. ("Kvaerner" or "Company") began constructing and operating a private, commercial shipyard on the premises of the Philadelphia Shipyard. (Ault Decl. ¶ 23.) Around the time Kvaerner began its operations, the Company negotiated with the Council over a first collective bargaining agreement, with the assistance of

4

the MTD. (Ault Decl. ¶ 23.) The parties successfully reached a collective bargaining agreement covering Kvaerner's employees at the shipyard.

The collective bargaining agreement contains a recognition clause that provides the agreement was being entered in to by Kvaerner and the Council, "consisting of: United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada[;] International Brotherhood of Electrical Workers[;] Iron Workers[;] Boiler Makers[;] Carpenters[;] Asbestos Workers[;] Sheet Metal Workers[;] Machinists[;] Laborers[;] Operating Engineers[;] Painters hereinafter referred to as the 'Union.'" The agreement further recognized the "Union" as the exclusive bargaining representative for all production and maintenance employees of Kvaerner Philadelphia Shipyard, Inc.

The collective bargaining agreement contains a grievance and arbitration procedure in Article 16 as well as a "no strike" clause in Article 17. Sections 1 through 3 of the no-strike clause provide:

> SECTION 1. There shall be no strikes, picketing, slowdowns, sit-downs, sit-ins, sick-outs, cessation of work, boycotts (Whether primary or secondary, refusals to cross picket-lines, interruptions of operations or any other interference direct or indirect, with the orderly discharge of the Company's operations and employees' duties and functions during the term of this Agreement. It is understood that the foregoing sentence applies to any strike, slowdown, sick-out, sit-down, sit-in, refusal to cross picket-lines, or other interference or interruption, direct or indirect with the operations of the Company in support of or in sympathy with any strike or other job action by any other union or group of persons. An employee who engages in any such prohibited activity may be discharged or disciplined.
>
> SECTION 2. the Union, its officers, agents, representatives and members shall not in any way, directly or indirectly authorize, ratify, assist, encourage, participate in, sanction, condone or lend support to any strikes, picketing, slowdowns, sit-is, sit-downs, sick-outs, cessation of work) [sic] [,] boycotts (whether primary or secondary), interruptions of operations or any other interference, direct or indirect, with the operations of the Company or employees' dudes [sic] and functions. Employees who have engaged in such conduct shall be subject to discharge or other discipline. Should any employee engage in such conduct without Union authorization or ratification, the Union shall be obligated

5

to support the Company and endeavor within twenty-four (24) hours after receipt of written notice thereof from the Company to bring about a cessation of such conduct. In addition to any other liability, remedy, or right provided in applicable law, statute or the preceding paragraph, the Union, within twenty-four (24) hours, upon the company's request, shall:

> A. Publicly disavow such actions by the employees.
> B. Advise the Vice President of Human Resources in writing that such employee action has not been authorized or sanctioned by the Union.
> C. Notify employees of its disapproval of such action and instruct employees to cease such action and return to work immediately.
> D. Post notices on all bulletin boards advising employees that it disapproves of such action and instructs them to return to work immediately.

SECTION 3. If, following such a request by the Company, the Union fails to order striking employees to abandon the strike, the Union shall be deemed responsible for the strike and for all damages suffered by the Company from the time said written request is made.

(*See* Plaintiff's Complaint Seeking Preliminary Injunction and Temporary Restraining Order ("Pl. Compl."), Ex. A at 15-16.) The collective bargaining agreement also contains a provision on subcontracting in Article 28. (*Id.* at 22.)

    **B.**    <u>**The Events Underlying Kvaerner's Motion for Preliminary Injunction**</u>

On or about June 11, 2002, members of Asbestos Workers Local 14 set up a picket line at the Philadelphia Shipyard. (Verification of Michael Giantomaso ("Giantomaso V.S.") ¶ 9.) Apparently, two Local 14 officers—Martin Campbell and Stephen Pettit—were present at the picket line. (*Id.*)

It is the understanding of the Council that Asbestos Workers Local 14 set up the picket line to engage in area standards picketing. (Ault Decl. ¶ 35.) In engaging in such picketing, these defendants are informed, the members of Local 14 were protesting a particular insulation contractor's payment of wages to its employees at the shipyard that were below the area standards for insulators engaged in the building and construction trades. (*Id.*) Local 14 manned

6

the picket line with its building and construction trades members. (*Id.*)  In the Council's understanding of the situation, Local 14 was not picketing because of any dispute with Kvaerner itself or arising under the Kvaerner-PMTC collective bargaining agreement, such as a dispute over subcontracting. (*Id.*)

Neither the Council nor its authorized representatives engaged in any picketing at the Philadelphia Shipyard. (Ault Decl. ¶ 33.)  Moreover, no employee at the Shipyard engaged in any picketing, striking or boycotting in violation of the no-strike clause. (*Id.*)  Furthermore, all of the employees at the Shipyard reported to work. (*Id.*)  The Council itself does have a dispute with Kvaerner of many month's duration over violation of the subcontracting clause; but, as Exhibit B to plaintiff's own papers demonstrates, the Council *has* properly processed that dispute through the grievance and arbitration procedure of the agreement.

In addition, while Kvaerner complains about an alleged violation of the no-strike clause, Kvaerner itself may have failed to comply with the provisions of Section 2 of the no-strike clause.  The Company does not allege that it sent any written notice to the Council regarding an unauthorized work stoppage, strike, picketing or boycott.  Insofar as Defendant Ault is concerned, he has not received such notice.  As explained above, the written notice operates as a "trigger", thereby requiring the Council to take certain steps in order to bring an end to an unauthorized work stoppage.  Section 3 also specifically provides that the Union is responsible for damages only if it fails to take action after receiving that written notice.

Notwithstanding the absence of any written notice, the MTD sent a letter to all of the Defendants named in Kvaerner's complaint. (Ault Decl. ¶ 39.) The letter informed the Defendants of the Court's temporary restraining order and that the picketing was not authorized by the Council or the MTD and that both entities disapproved of the picketing. (*Id.*)  The letter

further instructed that all employees should continue to work. (*Id.*) The MTD sent the letter in response to the entry of the temporary restraining order. (*Id.*)

### III.   STANDARD FOR OBTAINING A *BOYS MARKET* INJUNCTION

As the moving party, Kvaerner bears the burden of establishing its entitlement to a *Boys Market* injunction. *Parade Publications, Inc. v. Philadelphia Mailers Union No. 14*, 459 F.2d 369, 373 (3d Cir. 1972). In recognition of the developing role of arbitration as a means of resolving labor disputes, enforceable under Section 301 of the Labor-Management Relations Act, the Supreme Court crafted an exception in *Boys Market* to Section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, which deprives federal courts of jurisdiction to issue injunctions that would prohibit certain specified acts in connection with a labor dispute, including "(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence." 29 U.S.C. § 104(e). The Supreme Court summarized that burden as follows:

> A District Court entertaining an action under Sec. 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of the injunction than will the union from its issuance.

*Boys Market, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 254 (1970).

In applying this standard, the District Court should be guided by several fundamental principles underlying the Supreme Court's decision in *Boys Market*. The concept of issuing an

8

injunction to enjoin a strike and order arbitration represents a "narrow" exception to the Norris-LaGuardia Act, 29 U.S.C. § 101, *et seq.*, from which the District Court draws its limited injunctive authority in labor disputes. The mere existence of such an exception does *not* mean that "injunctive relief is appropriate as a matter of course in every case of a strike over an arbitrable grievance." *Boys Market, Inc.*, 398 U.S. at 253-54. Most significantly in this case, the Court should never issue an injunction where the underlying dispute is not arbitrable under the grievance and arbitration procedure. *Buffalo Forge Co. v. United Steelworkers of Am.*, 428 U.S. 397, 407-09 (1976). Any such injunction would not further the parties' agreement to arbitrate disputes (since the dispute is not arbitrable) and would only contravene the Norris-LaGuardia Act's prohibition against issuing injunctions in labor disputes. *Id.*

## IV.    ARGUMENT

### A.    Kvaerner is Not Entitled to Injunctive Relief Because the Company Cannot Establish that the Underlying Dispute is Arbitrable

As the Supreme Court has noted, an action by an employer against a union to enforce a no-strike clause in a collective bargaining agreement may involve two disputes. *Jacksonville Bulk Terminals v. International Longshoremen's Ass'n*, 457 U.S. 702, 710 (1982). "First, there is the 'underlying dispute', which is the event or condition that triggers the work stoppage…[and] [s]econd, there is the parties' dispute over whether the no-strike pledge prohibits the work stoppage at issue." *Id.* at 710. It is not enough to prove that there may have been a violation of the no-strike clause. *Id.* at 721-22. Such a breach may well support a damage award in arbitration or in court, but in and of itself cannot be the basis for *injunctive relief* under the *Boys Market* exception to Norris-LaGuardia's anti-injunction provisions. *Id.* at 722. To obtain *Boys Market* injunctive relief, a plaintiff such as Kvaerner must prove that the picketing or other activity in violation of the no-strike clause was over an "underlying dispute" that is subject

9

to the grievance and arbitration procedure.  *Id.*; *Buffalo Forge Co.*, 428 U.S. at 406-08; *Boys Market*, 309 U.S. at 254.  As explained below, the Company cannot meet that burden.

In its moving papers, Kvaerner *alleges* that the Council and Asbestos Workers Local 14 have engaged in "picketing, strike and boycott activities" in order "to protest plaintiffs' utilization of a subcontractor to perform certain work pursuant to Article 28 of the Agreement." (Pl. Compl. ¶ 14.)  The Company further *asserts* that "defendants are engaging in picketing, boycott, and strike activity over a contractual issue subject to the CBA's express grievance procedure and in violation of the CBA's no picketing and strike provision."  (Plaintiffs' Memorandum of Law in Support of motion for Temporary Restraining Order Without Notice ("Pl. Memo.") at 5.)  While the Company refers to the Verification of Michael Giantomoso (Pl. Memo at 5), the verification contains no statement by Mr. Giantomoso that that "picketing" by Asbestos Workers Local 14 members concerned an underlying dispute involving the subcontracting provision of the collective bargaining agreement. (*See* Giantomoso V.S. ¶¶ 1-9.)  In short, Kvaerner thus far has failed to present any evidence, other than allegations and assertions, with its motion that establishes the underlying dispute is arbitrable.  *See Elsinore Shore Assocs. v. Local 54, Hotel Employees and Restaurant Employees Int'l Union*, 820 F.2d 62, 68-69 (3d Cir. 1987) (vacating *Boys Market* injunction where there was no evidence that the underlying dispute was arbitrable and finding dispute involved extra-contractual controversy over failure to reach new wage agreements under contractual reopener provision).

Contrary to Kvaerner's allegations, the underlying dispute in this case involves Asbestos Workers Local 14's concern that a non-union insulation contractor, who is performing work at the Philadelphia Shipyard, is undermining the area standards by paying its employees below the wage rates for insulators in the building and construction trades in Philadelphia.  (Ault Decl. ¶

34.) "Area standards picketing" is concerted activity by union members and individuals "to protest wage rates that are below the established area standards" and is protected by Section 7 of the National Labor Relations Act, 29 U.S.C. § 157 (2001). *International Longshoremen's Ass'n v. Ariadne Shipping Co.*, 397 U.S. 195, 200-01 (1970). The "area standards picketing" does not involve a dispute is over whether the insulation contractor should be present at the Shipyard or even whether that contractor should sign the Kvaerner agreement (which are issues that arguably implicate the subcontracting provision in the collective bargaining agreement). In engaging in area standards picketing, Local 14 was not denying or otherwise depriving Kvaerner of its ability to arbitrate subcontracting issues under the collective bargaining agreement. *Buffalo Forge Co.*, 428 U.S. at 408. Rather, the dispute underlying the area standards picketing "was not over any dispute between the Union and the employer that was even remotely subject to the arbitration provisions of the contract." *Id.* at 407. It does not involve any term or condition of the collective bargaining agreement between Kvaerner and the Council; instead, it involves the sub-par wage rates paid by the insulation contractor to its own employees, which Local 14 believes are undermining the area standards in Philadelphia.

Kvaerner's attempt to cast the "area standards picketing" as an underlying dispute involving the subcontracting provision further proves that injunctive relief is inappropriate. The "underlying dispute" is the dispute that triggers the picketing. In this case, as the Council understands it, the "underlying dispute", if any, is the non-union insulation contractor's payment of wages below the area standards. The area standards dispute was not triggered by the subcontracting provision in the collective bargaining agreement; rather, the subcontracting provision was brought into the case by Kvaerner in response to the area standards picketing. *Jacksonville Bulk Terminals*, 457 U.S. at 721. This represents an improper attempt by the

Company to bootstrap the area standards picketing onto an existing grievance that is set to be arbitrated *at the request of the Council*.  (Pl. Compl., Ex. B.)  At most, the Company's arguments amount to describing "the effect rather than the cause" of Local 14's area standards picketing. *Elsinore Shore Assocs.*, 820 F.2d at 69.   However, such characterizations of the underlying dispute are insufficient to establish that they are arbitrable.  *Jacksonville Bulk Terminals*, 457 U.S. 721-22; *Elsinore Shore Assocs.*, 820 F.2d at 69.

Without an arbitrable underlying dispute, Kvaerner's motion amounts to little more than a request for injunctive relief to enjoin picketing that allegedly violates the no-strike clause.   The Supreme Court has held that the *Boys Market* exception to Section 104 of the Norris-LaGuardia Act does not allow a court to enjoin picketing simply because the picketing violates the no-strike clause. *Jacksonville Bulk Terminals*, 457 U.S. at 722;  *Buffalo Forge Co.*, 428 U.S. at 408.  A court cannot issue a *Boys Market* injunction merely to enjoin contract violations.   *Buffalo Forge*, 428 U.S. at 409-10.  The purpose of a  *Boys Market* injunction is to preserve the arbitration procedure as a means of resolving arbitrable disputes and to protect it from being undermined by unilateral acts of one of the parties to the collective bargaining agreement.  *Id.* at 410-11.  Given that Kvaerner cannot establish an arbitrable underlying dispute in this instance, the Company is not entitled to a *Boys Market* injunction.

### B.     Kvaerner Cannot Establish that the Equities Favor Issuing the Injunction

Even assuming *arguendo* that Kvaerner could establish the existence of a dispute under the collective bargaining agreement that is arbitrable, it cannot establish that the equities favor the issuing of a *Boys Market* injunction.  As explained *supra* in Section III, Kvaerner must establish whether breaches of the no-strike clause are occurring or will occur, that the Company

12

has suffered irreparable injury, and that the Company will suffer more harm if the injunction is not issued than the Council will suffer if the injunction is issued. Kvaerner fails on all counts.

First, there has been no unlawful picketing that would fall within the no-strike clause. No employee at the Shipyard has left his or her job and went on strike. No employee at the Shipyard has left his or her job to man a picket line. No employee at the Shipyard has expressed any support for Local 14's picket line by honoring that line and/or slowing down his or her work. The facts of this case involve a picket by <u>non-employees</u> in protest of the wages paid by an employer other than Kvaerner itself, an insulator contractor who happens to be performing work at the Philadelphia Shipyard. Insofar as we are aware, Kvaerner cannot present any evidence to establish that any employee covered by the agreement breached the no-strike clause or intends to breach it in the near future.

Second, Kvaerner cannot establish "irreparable harm" as that phrase is utilized in the *Boys Market* context. In its moving papers, the Company claims it will suffer "great and irreparable damage" in that: "(a) Plaintiff will be unable to perform all of its work; (b) Plaintiff will be denied the use and possession of its property; (c) Plaintiff will be denied delivery of essential supplies; (d) Plaintiff's employees who choose to work will be subject to unlawful harassment." (Pl. Compl. ¶ 17.) Setting aside the lack of any evidentiary support for any of these assertions (not even Mr. Giantomaso addresses the question of what harm will be suffered in his verification), none of these forms of "great and irreparable damage" constitute irreparable harm as a matter of law for purposes of obtaining a *Boys Market* injunction. Because money damages usually can compensate an employer for any losses occasioned by an unlawful strike, the basis for finding irreparable harm in such cases usually is where the picketing will frustrate or vitiate the arbitration process itself. *See Local Lodge No. 1266, Int'l Ass'n of Machinists v. Panoramic*

*Corp.*, 668 F.2d 276, 285-86 (7th Cir. 1981) (finding irreparable injury is not "simply any injury resulting from a breach of contract that would not be fully redressed by an arbitral award" but injury that is so irreparable that it would frustrate arbitration). In this case, Kvaerner cannot establish any frustration or vitiation of the arbitration process because, in its own papers, it provides evidence that the process is alive and well. Exhibit B to the Plaintiff's Complaint is a letter from Defendant Ault to Mr. Giantomaso in which the Council invokes the arbitration procedure to resolve the Council's dispute with Kvaerner over subcontracting. (Pl. Compl., Ex. B). Kvaerner has not alleged or submitted evidence that Local 14's areas standards picketing threatens this arbitration process and fails to establish irreparable injury for purposes of a *Boys Market* injunction.

Finally, the balance of the equities does not favor Kvaerner. As explained above, Kvaerner cannot satisfy the other elements of the *Boys Market* injunction, including irreparable harm. The Council, Mr. Ault and Mr. Rowan *will* suffer hardship if an injunction is issued, given that they did not engage in the picketing and that the Council has been following its contractual obligations. Enjoined for acts they did not itself engage in, the Defendants could nevertheless be subject to contempt if violations of the Court's order should occur in the future.

      C.    **Even Assuming the Kvaerner Satisfies the Prerequisites for an Injunction, Kvaerner Cannot Prove that it is Appropriate to Enjoin the Council**

Even assuming Kvaerner can demonstrate the equities favor it and even assuming the Company can establish an arbitrable dispute, Kvaerner still fails to prove that an injunction should issue against the Council, Mr. Ault or Mr. Rowan. Kvaerner presents no evidence with its papers that proves the Council, Mr. Ault, Mr. Rowan and/or their authorized representatives engaged in any picketing or other unlawful acts. At most, the Company presents the assertions of Mr. Giantomaso in his verification that members of Asbestos Workers Local 14 engaged in

14

picketing on June 11, 2002. (Giantomaso V.S. ¶ 9.)  Thus, by naming the Council and Mr. Ault and Mr. Rowan as Defendants, Kvaerner's only basis for holding the Council liable is if it can impute liability for Local 14's actions upon these Defendants.

Section 106 of the Norris-LaGuardia Act provides that "[n]o officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon <u>*clear proof*</u> of actual participation in, or actual authorization of, such acts , or ratification of such acts after actual knowledge thereof." 29 U.S.C. § 106 (2001) (emphasis added).  "Clear proof" is "proof which is clear, unequivocal and convincing."  *United Steelworkers of Am. v. Lorain*, 616 F.2d 919, 921 (6th Cir. 1980). Without such evidence, the Company cannot establish liability for purposes of obtaining an injunction.  Kvaerner provides no evidence, let alone clear proof, that the Council, Mr. Ault or Mr. Rowan actually participated in, authorized or ratified the acts of Local 14.

The Council, Mr. Ault and Mr. Rowan recognize that, in enacting the Labor-Management Relations Act, Congress established that liability in actions under that statute, such as a Section 301 action, can be established using the common law of agency.  *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 736 (1966).  Kvaerner brought this action as a putative Section 301 action.  As explained in the previous sections, however, the Company has failed to establish the necessary prerequisites for Section 301 jurisdiction to obtain a *Boys Market* injunction.  Thus, the Council, Mr. Ault and Mr. Rowan believe that Section 6 applies to this case and the Court should hold Kvaerner to establishing "clear proof" of authorization, participation or ratification.

But even assuming Section 301 jurisdiction exists for issuing an injunction, Kvaerner fails to satisfy the common law agency standard.  *See* 29 U.S.C. §§ 185(b), 185(e) (2001). *See*

15

*also Philadelphia Marine Trade Ass'n v. Local 1291, Int'l Longshoremen Ass'n*, 909 F.2d 754 (3d Cir. 1990); *Pittsburgh-Des Moines Steel Co. v. United Steelworkers of Am.*, 633 F.2d 302 (3d Cir. 1980). *See*, *generally*, *Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212 (1979) (holding international union cannot be held liable for wildcat strike by local union unless it is proven international union authorized, instigated, encouraged or ratified strike).

Both Third Circuit cases illustrate how Kvaerner has failed to establish a basis to enjoin the Council, Mr. Ault and Mr. Rowan. In *Philadelphia Marine Trade Ass'n*, the Third Circuit found an absence of any evidence that the international union authorized, instigated, encouraged or ratified the strike and the court denied the injunctive relief. 909 F.2d at 759. In *Pittsburgh-Des Moines Steel Co.*, the Third Circuit held that a court cannot issue a *Boys Market* injunction against an international union because of the local union's engaging in picketing that breaches a no-strike clause and that concerns an arbitrable underlying dispute <u>unless</u> the movant makes an additional showing. *Pittsburgh-Des Moines Steel Co.*, 633 F2.d at 308. In the context of this case, this additional showing requires Kvaerner to prove (1) that the order enjoining Local 14 "will not be fully effective;" (2) that the steps already taken by the Council "are not likely to be effective;" and (3) "that specific additional steps, carefully specified in the order, will add significantly to the deterrent effect of the injunction against the local and its members." *Id.* Even after this heightened showing, the Court should still consider "whether, in the view of the union, the inevitable intrusion upon the internal affairs of the union, the marginal potential increase in the effectiveness of the *Boys Market* injunction is justified." *Id.* In this case, the standard is not met.

The Company has not set forth any averments as to how an injunction against Asbestos Workers Local 14 will not be effective, what steps the Council took that were ineffective, and

what steps the Council could take that would be effective.  Indeed, there is a dearth of evidence to support a claim that an order against Local 14 would not be effective.  *See Pittsburgh-Des Moines Steel Co.*, 633 F.2d at 308.   Furthermore, the Council has no control over Asbestos Workers Local 14 if that local union wants to engage in areas standards picketing on behalf of its building and construction trades members.  The Council cannot discipline Asbestos Workers Local 14, its officers or its members for their activities.  (Ault Decl. ¶¶ 37-38.)  The MTD, on behalf of the Council, sent a letter to all Defendants instructing them that neither the MTD nor the Council authorized or approved of the picketing and that all employees should return to work.  There was nothing more that the Council could do in these circumstances.  *See Pittsburgh-Des Moines Steel Co.*, 633 F.2d at 308.

In addition, as explained above, Section 2 of the no-strike clause requires the Council to undertake four steps (including sending a letter disavowing the work stoppage or picketing and ordering employees to return to work, which has already been done) within 24 hours of written notification by Kvaerner.  The Company has not alleged that it has followed this procedure.  Assuming that is the case, the Company's failure to follow that procedure undermines any claim against the Council at this point.  In such circumstances, the employer should avail itself of the contractual procedure before it seeks to impose liability upon the Council.

## V.     CONCLUSION

In summary, Kvaerner has failed to establish that the facts of this case warrant the issuance of a *Boys Market* injunction. Kvaerner's failure to establish an arbitrable underlying dispute, its failure to establish the equities favor the Company and its failure to establish that an injunction is warranted against the PMTC all prove that this case falls within the *Buffalo Forge* and *Jacksonville Bulk Terminals* exception to *Boys Market*.  Accordingly, for the foregoing

reasons, Defendants Philadelphia Metal Trades Council, Ron Ault and Philip Rowan respectfully request that the Court deny the Plaintiffs' Motion for Preliminary Injunction.

                              Respectfully submitted,

By: _____
     Robert Curley (Bar No. 55760)
     David Capuano (Bar No. 70238)
     **O'DONOGHUE & O'DONOGHUE**
     Constitution Place, Suite 515
     325 Chestnut Street
     Philadelphia, PA 19106
     (215) 629-4970

     Robert Matisoff
     Keith R. Bolek
     **O'DONOGHUE & O'DONOGHUE**
     4748 Wisconsin Avenue, N.W.
     Washington, D.C. 20016
     (202) 362-0041

     Counsel for the Defendants Philadelphia Metal Trades Council, Ron Ault and Philip Rowan